IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 1:17-cv-01744

RUBEN ARAGON;

JOHN SPRING;

ROBERT WIEGHARD;

DAVID POOLE;

JAMES BRATT;

AARON MILLER;

GEORGE MILLER; and

EDWARD KANETA,

       Plaintiff(s),

v.

RICK RAEMISCH, in his official capacity as Executive Director of the Colorado Department of Corrections;

RISHI ARIOLA-TIRELLA, in his official capacity as Interim Chief Medical Officer of the Colorado Department of Corrections; and

RENAE JORDAN, in her official capacity as the Director of Clinical and Correctional Services of the Colorado Department of Corrections,

       Defendants.

---

## FIRST AMENDED CLASS ACTION COMPLAINT

---

Plaintiffs Ruben Aragon, John Spring, Robert Wieghard, David Poole, James Bratt, Aaron Miller, George Miller, and Edward Kaneta bring this complaint against Rick Raemisch, Rishi Ariola-Tirella, and Renae Jordan, respectively in their official capacities as officers of the Colorado Department of Corrections ("CDOC"), for declaratory and injunctive relief on behalf of themselves and all others similarly situated and allege the following:

## I. INTRODUCTION

1.      CDOC intentionally and systematically delays and denies necessary medical care to prisoners suffering from chronic infection with the Hepatitis C virus ("HCV"), thereby placing them at substantial and unnecessary risk of severe illness and death. Since 2014, when the Food and Drug Administration ("FDA") approved breakthrough Direct Acting Anti-Viral ("DAA") medications, a full cure for HCV has been available, with no significant adverse side effects. The community standard of care, as endorsed by major medical associations, now requires treating *all* chronic HCV patients with DAAs. Yet CDOC denies these life-saving cures, without medical justification, to over 97% of the thousands of CDOC prisoners who need them, including Plaintiffs here.

2.      In 2016, when she was CDOC's Chief Medical Officer, Dr. Susan Tiona, stated that CDOC's policy means that prisoners will continue to die from Hepatitis C for the next decade, and prisoners will continue to suffer adverse medical complications from HCV for an additional decade.

3.      CDOC's chilling calculations, and its policies and practices, show deliberate indifference to prisoners' serious medical needs, in violation of the Eighth Amendment to the United States Constitution.

ACTIVE\50822207.v6-9/9/17

4.      Plaintiffs are CDOC prisoners with chronic HCV infection who bring this action on behalf of themselves and a class of similarly-situated prisoners. They seek declaratory and injunctive relief.

## II. JURISDICTION AND VENUE

5.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) as Plaintiffs' claims under 42 U.S.C. § 1983 arise under the laws of the United States and allege violations of the United States Constitution.

6.      Venue is proper pursuant to 28 U.S.C. § 1391, because each of the Defendants is domiciled in the District of Colorado and the acts and omissions giving rise to Plaintiffs' claims occurred in this District.

## III. PARTIES

**Plaintiffs**

7.      Plaintiff Ruben Aragon is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

8.      Plaintiff John Spring is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

9.      Plaintiff Robert Wieghard is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

10.     Plaintiff David Poole is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

11.     Plaintiff James Bratt is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

12.     Plaintiff Aaron Miller is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

13.     Plaintiff George Miller is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

14.     Plaintiff Edward Kaneta is a prisoner in the custody of CDOC.  He suffers from chronic HCV infection, which CDOC refuses to treat.

15.     Each of the above named Plaintiffs has exhausted all administrative remedies available to him, in accordance with 42 U.S.C. § 1997e(a).

**Defendants**

16.     Defendant Rick Raemisch is the Executive Director of CDOC. In that capacity, he has oversight and authority over all aspects of the management and governance of the entire CDOC, including each Colorado penitentiary. He has overall responsibility for the CDOC budget and for ensuring the delivery of necessary medical care for the serious medical needs of all prisoners in the custody of CDOC. He is sued in his official capacity. At all relevant times, Defendant Raemisch has acted and will continue to act under color of state law.

17.     Defendant Rishi Ariola-Tirella is CDOC's Interim Chief Medical Officer.  He is responsible for overseeing the provision of medical care in CDOC.   Dr. Ariola-Tirella specifically approved and signed CDOC's revised Clinical Standards and Procedures for Hepatitis C Evaluation, Management and Treatment, dated August, 2017, a protocol promulgated by CDOC after the filing and service of the initial Complaint in this case.  He is sued in his official capacity. At all relevant times, Dr. Ariola-Tirella has acted and will continue to act under color of state law.  For many years prior to the filing of this lawsuit and through the

4

early months of 2017, Dr. Susan Tiona was CDOC's Chief Medical Officer.  In this First Amended Class Action Complaint, all comments, quotations, actions and inactions attributed to Dr. Tiona were made and carried out while she served as CDOC's Chief Medical Officer and in her official capacity as CDOC's Chief Medical Officer.  Dr. Tiona specifically approved and signed several prior versions of CDOC's Clinical Standards and Procedures for Hepatitis C Evaluation, Management and Treatment, including the version dated November, 2016, that was in effect when this lawsuit was filed.

18.     Defendant Renae Jordan is the Director of Clinical and Correctional Services of CDOC.  She is responsible for overseeing the provision of medical care in CDOC.  Defendant Jordan specifically approved and signed both the November, 2016, and the August, 2017, versions of CDOC's Clinical Standards and Procedures for Hepatitis C Evaluation, Management and Treatment.  Defendant Jordan is sued in her official capacity.  At all relevant times she has acted and will continue to act under color of state law.

## IV. FACTS

### A.     The Disease.

19.     HCV is the most common blood-borne viral infection in the United States. An estimated 3.2 million people in the country are chronically infected with HCV. In 2013 the virus caused more deaths than sixty other infectious diseases combined, including HIV, pneumococcal disease, and tuberculosis.

20.     The liver plays a crucial role in processing nutrients, filtering toxins from the blood, preventing disease, and making possible essentially all metabolic processes in the body. Chronic HCV infection causes inflammation of the liver, eventually, if untreated, leading to

diminished liver function, liver failure and liver cancer, requiring consideration for a liver transplant.

21.     There are several different genotypes of HCV. The genotype determines which of the many DAA medications available today are administered to the patient. Genotype 1 is the most common type of HCV in the United States.

22.     The severity of liver damage due to HCV is commonly described by the Metavir fibrosis score ("MFS"), which assigns a number from 0 to 4 to correspond to the degree of scarring of the liver caused by the progression of the disease. An MFS of F0 indicates no liver scarring, and F1 indicates minimal liver scarring. F2 is an intermediate stage of fibrosis. A score of F3 indicates severe fibrosis, and F4 indicates cirrhosis.

23.     Chronic HCV is an inflammatory disease in and of itself, regardless of the degree of liver scarring. At all stages of liver fibrosis, HCV is associated with adverse health effects. Left untreated, it increases a person's risk of developing heart disease, diabetes, B cell lymphoma and other cancers, Parkinson's disease, and kidney disease. Likewise, chronic HCV often causes other extrahepatic manifestations such as chronic fatigue, severe depression, and arthritis. For persons with chronic HCV, each day without treatment increases the likelihood of these conditions.

**B.      Treatment.**

24.     For years, the best treatment for HCV was a combination of two drugs: interferon and ribavirin.  This treatment, often referred to as "combination therapy," lasted 48 weeks and caused serious side effects such as thrombocytopenia, anemia and severe depression.  Worse, the

treatment had a low effectiveness rate.  Combination therapy only had a less than 60% success rate against HCV genotype 1.

25.     In 2011 the FDA approved two protease inhibitors that increased the likelihood of successful treatment when either was added to combination therapy.  The so-called "triple therapy" became the standard of care for genotype 1 patients.  Triple therapy lasted just as long as combination therapy and had the same and additional severe side effects.

26.     In 2013 and 2014 the landscape for treating HCV changed dramatically.  The FDA approved the use of DAA medications for the treatment of HCV.  These drugs now include, but are not limited to, Sovaldi, Harvoni, Olysio, and Viekira Pak.  All of these drugs were designated as "breakthrough therapies" by the FDA, an official classification that is reserved for drugs proven to provide substantial improvement over available therapies for patients with serious or life-threatening diseases.

27.     DAA medications generally reduce treatment length to eight to twelve weeks. They dramatically reduce adverse side effects, and they have well over a 90% success rate in curing the disease.

28.     According to evidence-based, expert-developed guidelines published by the American Association for the Study of Liver Diseases and the Infectious Diseases Society of America ("AASLD/IDSA Guidelines"), DAAs are now "recommended for *all* patients with chronic HCV infection," with the narrow exception of patients "with short life expectancies that cannot be remediated by treating HCV, by transplantation, or by other directed therapy." American Association for the Study of Liver Diseases & Infectious Diseases Society of America, *When and in Whom to Initiate HCV Therapy.  Recommendations for Testing, Managing, and*

7

*Treating Hepatitis C* (July 6, 2016) (emphasis added), *available at* http://www.hcvguidelines.org/evaluate/when-whom [accessed July 19, 2017].

29.      The AASLD/IDSA Guidelines specifically urge treatment with DAAs in the very early stages of the disease. They explicitly repudiate the idea that DAA drugs should be prescribed only for patients with significant liver damage, and instead urge that virtually all individuals infected by HCV receive DAA treatments regardless of their fibrosis score.

30.      The AASLD/IDSA Guidelines represent the professionally-accepted clinical standard of care for treatment of HCV in the United States and in Colorado. Medicare, the U.S. Department of Veterans Affairs, and major health insurance providers all follow the AASLD/IDSA Guidelines by providing DAAs to all persons with chronic HCV infections, except those with short life expectancies.

**C.      HCV in the Colorado Department of Corrections.**

31.      HCV is more prevalent in prisons than in the general population. One study estimates that between 12% and 35% of the national prison population is infected with the virus. National Hepatitis Corrections Network, *An Overview of Hepatitis C in Prisons and Jails*, (Feb. 22, 2016), *available at* http://www.hcvinprison.org/resources/71-main-content/content/191-hepcprison#_edn3 [accessed July 19, 2017].

32.      According to the CDOC's monthly inmate population report, as of June 30, 2017 the department listed its total population of incarcerated prisoners as 20,101, *available at* https://www.colorado.gov/pacific/cdoc/departmental-reports-and-statistics          (Dashboard Measures) [accessed July 19, 2017].  As of November 2016, CDOC reported that it was aware of 2,280 prisoners who had been diagnosed with HCV.

8

33.     When CDOC provides treatment for chronic HCV infection, it does provide DAA medications.   However, CDOC provides treatment with DAAs to very few prisoners with chronic infection.  Instead, CDOC deliberately and intentionally delays and denies treatment to the overwhelming majority of prisoners who are living with chronic HCV, including Plaintiffs here.

### 1.     *Determining eligibility for treatment.*

34.     Defendants' written policy, titled *Standards for Hepatitis C Evaluation, Management and Treatment* ("Standards") memorializes CDOC's practice of withholding necessary medications from the overwhelming majority of prisoners who need them.  As of the time of filing of the initial Complaint in this case, the Standards in force were those approved in November 2016.  After the commencement of this case, CDOC promulgated a revised version of the Standards, effective August 2017.  The August 2017 Standards modified some of CDOC's procedures but failed to cure the fundamental constitutional violation that prompts Plaintiffs to bring this lawsuit: CDOC continues to delay and deny necessary medical treatment that accords with the community standard of care to the Plaintiffs and similarly situated prisoners suffering from chronic HCV.   The August 2017 protocols are referred to herein as the "Revised Standards."

35.     As a first step in screening prisoners for "treatment eligibility," CDOC relies on a blood test, known as the APRI score that roughly correlates to the degree of liver fibrosis. A prisoner's APRI score is the ratio derived by comparing the prisoner's level of aspartate aminotransferase ("AST"), an enzyme in the blood, with the usual amount of AST in a healthy person's blood and the prisoner's platelet count.

9

36.     When this lawsuit was filed, CDOC's November 2016 protocol specified that prisoners with an APRI score below 0.7 are not eligible for treatment and will not be considered for treatment.  The Revised Standards continue to bar prisoners with APRI scores below 0.7 from receiving treatment.  They will, however, be offered yearly APRI score screening.

37.     The Revised Standards specify that in order to be considered for treatment, prisoners must have an APRI score of at least 0.7.  An APRI score of 0.7 is roughly equivalent to a fibrosis score of F2.  A lower APRI score, however, does not necessarily indicate an absence of significant fibrosis.

38.     Even an APRI score of 0.7 or greater, which is evidence of significant fibrotic liver changes, only makes a prisoner eligible for referral to the CDOC Infectious Disease Committee ("Committee") for "consideration" for treatment.

39.     Under the prior version of the Standards, prisoners with any level of an APRI score of 0.7 or higher were first required to complete a program of alcohol and drug treatment provided by CDOC, even if the required program was not available in the facility where the prisoner was housed.

40.     There was no medical justification for CDOC's requirement of substance abuse treatment as a prerequisite to HCV treatment. The requirement unjustifiably delayed a prisoner's ability to be even considered for treatment under CDOC's Standards.

41.     Additionally, to be "considered" for DAA medication treatment, the prior Standards required that a prisoner must demonstrate what CDOC regarded as "an absence of high-risk behavior" during the pendency of the alcohol and drug treatment.  This standardless requirement had no medical justification.  CDOC regards any disciplinary offense involving

10

alcohol, prescription drugs, illegal drugs, tattooing, or sexual activity as evidence of "high risk behavior" that disqualifies the prisoner for treatment until alcohol and drug classes are repeated *and* a minimum of one year has passed since the last "offense." In such a case, a prisoner with an APRI score of 0.7 could wait as long as three and a half years before he would even be considered for medical treatment.

### 2.      *The prisoner selection process*.

42.      According to the Standards, the Committee is now expected to meet monthly – previously its meetings were quarterly – to assess whether a prisoner would be provided with medication to treat his HCV infection. If a prisoner is not selected for treatment "but remains eligible for treatment," the prisoner's application packet is returned to the application "pool" and is considered for a future meeting. There is no guarantee that a prisoner who is "eligible" for treatment or "considered" for treatment will actually receive DAA medications. Under CDOC's policies, a prisoner with chronic HCV can comply with each and every precondition for treatment yet still be denied access to DAA medications, with no medical justification for the denial.

43.      No matter how many prisoners need treatment according to medical standards, and no matter how many prisoners are "eligible" for treatment under CDOC's unjustifiably restrictive Revised Standards, CDOC further limits treatment by relying on an artificial quota. On information and belief, prior to the filing of this case, that quota was 30 prisoners per year.

### 3.      *Treatment in practice*.

44.      HCV was a contributing factor in six prisoner deaths department wide in CDOC's fiscal year 2013-14. The disease contributed to five deaths in fiscal year 2014-15. In fiscal year

2015-16, HCV contributed to seven deaths department wide.  On information and belief, another prisoner died of complications of the disease even after the filing of this civil action.

45.     Despite these deaths, CDOC deliberately chooses to limit the number of prisoners to whom it provides the curative and life-saving DAA treatments for HCV.  No matter how many prisoners manage to qualify as "eligible" for treatment under CDOC's unjustifiably restrictive Revised Standards, CDOC chooses to supply only a limited amount of DAAs to an extremely limited number of prisoners.  As a result, CDOC is deliberately choosing to allow additional CDOC prisoners to die from untreated HCV.

46.     Last year, in an email to then-Senator Pat Steadman, now-retired Dr. Tiona explained that CDOC planned to "continue to identify and prioritize [only] the sickest individuals for treatment each quarter." That plan, Dr. Tiona stated, "should be effective in eliminating Department-wide deaths from hepatitis C *within the next decade*, and … should be effective in eliminating all additional complications from hepatitis C *by 2035*." (emphasis added).

47.     There is no medical justification for CDOC's decision to withhold a life-saving cure from the thousands of prisoners living with chronic HCV.

48.     Using CDOC's overly restrictive criterion of an APRI score greater than 0.7, Dr. Tiona estimated that 735 prisoners "are candidates for treatment to cure their Hepatitis C infection."  If CDOC continues to treat only 30 prisoners each year, treatment of this group will take more than 24 years.  Meanwhile, CDOC's Revised Standards deny treatment altogether for more than 1,500 prisoners whose APRI score does not reach CDOC's arbitrarily-set minimum.

49.     CDOC has announced plans, for the 2017-18 fiscal year, to begin DAA therapy for as many as 70 prisoners.   Despite this incremental improvement, Defendants remain deliberately indifferent to prisoners' serious medical needs.   Treating 70 prisoners per year means that CDOC will take more than 10 years to treat the 735 prisoners whose APRI scores today already indicate advancing fibrosis, without accounting for new prisoners with HCV who enter the CDOC system, or current prisoners whose advancing APRI scores during that 10 years move them into the greater-than-0.7 group.   Dr. Tiona acknowledged that waiting that long to complete treatment for this group of prisoners risks "permanent damage to the liver which could result in life-long complications, even after cure."[1]   Moreover, CDOC's plan continues to deny treatment to the more than 1,500 prisoners whose APRI score does not rise to the level of 0.7.

50.     Defendants refuse to meet the community standard of care, which requires that they provide treatment to all those prisoners with chronic HCV infections, including Plaintiffs. Defendants' public assertions that the Department's policies and practices are consistent with the AASLD's guidelines are false, in that the Department's policies and practices fail to ensure that all prisoners with chronic HCV infection who are medically appropriate for DAA treatment are given these life-saving medications.   Rather, Defendants have deliberately adopted a budget that fails to provide DAAs to the overwhelming majority of prisoners who need them.   To facilitate this budgetary choice, Defendants have promulgated, implemented, and enforced policies and practices that are deliberately designed, unjustifiably, to delay and deny necessary medical treatment to all but a small fraction of the prisoners with chronic HCV infections.   In doing so,

---

[1] Letter dated January 31, 2017, "To Whom It May Concern," from Susan M. Tiona, M.D.

Defendants demonstrate systemic, deliberate indifference to the serious medical needs of Plaintiffs and the class of prisoners with chronic HCV, in violation of the Eighth Amendment.

**D.**     **Allegations Regarding Named Plaintiffs.**

        **1.**     ***Plaintiff Ruben Aragon.***

51.     Plaintiff Ruben Aragon is 58 years old.  He was diagnosed with HCV in 1998. Mr. Aragon entered CDOC in 2011 and is serving a 70-year sentence.   He is currently incarcerated at the Arkansas Valley Correctional Facility.

52.     CDOC has repeatedly denied Mr. Aragon requested treatment for his chronic HCV.

53.     Mr. Aragon has been told that his blood tests demonstrate that his APRI score is sufficiently high to be considered for treatment by the Committee.

54.     Mr. Aragon had previously completed a six-month Substance Abuse Education Program while in CDOC.  Nonetheless, he has been told he will not be considered for treatment unless he also completes the Therapeutic Community program.

55.     The Arkansas Valley Correctional Facility, where Mr. Aragon is currently housed, does not offer the Therapeutic Community program.

56.     Mr. Aragon challenged the lack of treatment for his chronic HCV through the CDOC grievance process.  The CDOC denied his grievance at all three stages of the process. Accordingly, Mr. Aragon has exhausted all available administrative remedies.

14

2. ***Plaintiff John Spring.***

57.     Plaintiff John Spring is 61 years old.  He was diagnosed with HCV in 2004.  Mr. Spring entered CDOC in 1979 and is serving a life sentence.  He is currently incarcerated at the Sterling Correctional Facility ("SCF").

58.     CDOC has repeatedly denied Mr. Spring requested treatment for his chronic HCV.

59.     CDOC's restrictive policies have taken Mr. Spring on a bureaucratic roller coaster ride.  CDOC medical staff told Mr. Spring that he was eligible to be "considered" for treatment, then not eligible, then again was eligible, then ineligible, then eligible once again.

60.     On June 29, 2015, Nurse Practitioner Helene Christner counseled Mr. Spring regarding his HCV and informed him that he met all criteria for treatment.  She completed CDOC's Hepatitis C Evaluation Worksheet and specifically indicated that he qualified due to his APRI score and his completion of alcohol and drug classes.

61.     Nevertheless, on December 7, 2015, Nurse Practitioner Christner told Mr. Spring that he probably would not be approved for Hepatitis C treatment.  She indicated that according to his blood tests, he had not sustained sufficient damage to his liver to require treatment.  In Mr. Spring's medical records, she wrote "that with his AP[R]I score below 1.0 he does not meet the DOC criteria for treatment . . . ."

62.     The nurse practitioner's notation in Mr. Spring's medical records reflected a misunderstanding of CDOC's written policy.  At the time, the protocol said that a prisoner would be "considered" for treatment if the APRI score was higher than 0.7.

63.     Although Mr. Spring's 2015 records indicate that he had already satisfied CDOC's requirement of completing alcohol and drug classes before receiving treatment, the Committee apparently disagreed.  In February, 2016, the Committee determined that Mr. Spring would not receive treatment for his HCV until he first completed a CDOC drug and alcohol program "and any recommended treatment."

64.     To satisfy the Committee, Mr. Spring completed yet another drug and alcohol class.

65.     After Mr. Spring completed the class, Nurse Practitioner Christner told him that his "levels" had dropped and that he no longer qualified for treatment for HCV.

66.     Several months later, Nurse Practitioner Christner informed Mr. Spring that he once again qualified for HCV treatment.

67.     Mr. Spring still has not received treatment for his chronic HCV, which causes him fatigue.

68.     Mr. Spring challenged the lack of treatment for his chronic HCV through the CDOC grievance process. The CDOC denied his grievance at all three stages of the process. Accordingly, Mr. Spring has exhausted all available administrative remedies.

### *3.     Plaintiff Robert Wieghard.*

69.     Plaintiff Robert Wieghard is 61 years old.  He was diagnosed with HCV in the mid-1990s.  Mr. Wieghard entered CDOC in 1982 and is serving a life sentence.  He is currently incarcerated at the Bent County Correctional Facility.

70.     CDOC has repeatedly denied Mr. Wieghard requested treatment for his chronic HCV.

16

71.     Mr. Wieghard's APRI score is sufficiently high that he could be "considered" for treatment under CDOC's overly-restrictive policies.  Nevertheless, CDOC has refused to provide treatment because he has not completed classes on alcohol and substance abuse that the Committee regards as satisfactory.

72.     Mr. Wieghard has completed CDOC's Addiction Rehabilitation Program ("ARP").  Nevertheless, in a December, 2015 letter to Mr. Wieghard, a CDOC Infection Control Nurse stated that ARP is "no longer considered an acceptable treatment method."  The letter stated that before Mr. Wieghard may receive treatment for his HCV, he must complete a Therapeutic Community program.

73.     At the time that Mr. Wieghard received that letter, he was housed at the Arkansas Valley Correctional Facility, which did not offer a Therapeutic Community program.

74.     In May, 2016, Mr. Wieghard was transferred to the Buena Vista Correctional Facility so that he could participate in the Therapeutic Community program there.

75.     Because of a physical disability, however, Mr. Wieghard was unable to negotiate the stairs at Buena Vista Correctional Facility.  As a result, Mr. Wieghard was then transferred to the Bent County Correctional Facility.

76.     The Therapeutic Community program is not offered at the Bent County Correctional Facility, where Mr. Wieghard remains housed today.

77.     Thus, without medical justification, CDOC refuses to provide treatment to Mr. Wieghard unless he completes a Therapeutic Community program.  Yet CDOC houses Mr. Wieghard in a facility that does not offer that program.

78.     Mr. Wieghard challenged the lack of treatment for his chronic HCV through the CDOC grievance process.  The CDOC denied his grievance at all three stages of the process.  Accordingly, Mr. Wieghard has exhausted all available administrative remedies.

**4.     _Plaintiff David Poole._**

79.     Plaintiff David Poole is 52 years old.  He was diagnosed with HCV more than twenty years ago.  Mr. Poole entered CDOC in 2012 and is currently serving a seven-year sentence.  He is currently incarcerated at SCF.

80.     CDOC has repeatedly denied Mr. Poole requested treatment for his chronic HCV.

81.     In 2012 and 2013, Mr. Poole requested treatment for his Hepatitis C while he was housed at CDOC's Four Mile Correctional Center in Cañon City, Colorado.  Treatment was refused.  Officials there told him his "levels" were not high enough, but they did not say what those levels were.

82.     Defendants have continued to deny Mr. Poole's requests for treatment at SCF, where he has been housed since August, 2016.

83.     In October, 2016, SCF medical staff incorrectly calculated Mr. Poole's APRI score.  Because of the error, Mr. Poole was regarded, erroneously, as having an APRI score below 0.7, the threshold that CDOC's restrictive policies regard as the minimum for treatment to be "considered."  Nurse Practitioner Christner told Mr. Poole that his "levels" were not high enough to warrant treatment.

84.     Mr. Poole's APRI score, calculated correctly, indicates that he is far above the minimum that CDOC requires for a prisoner to be "considered" for treatment.

85.     Mr. Poole's health has been steadily declining.  He attributes the decline in his health to his untreated chronic HCV infection.  He has experienced bloating in his abdomen that he attributes to his worsening condition from HCV.  He has also developed a rash that has continued to spread.  His entire body itches constantly.  When he scratches his skin, he develops open sores, and he is concerned about the risk of spreading his HCV infection as a result.

86.     Mr. Poole challenged the lack of treatment for his chronic HCV through the CDOC grievance process.  The CDOC denied his grievance at all three stages of the process.  Accordingly, Mr. Poole has exhausted all available administrative remedies.

### 5.     *Plaintiff James Bratt.*

87.     Plaintiff James Bratt is 42 years old.  He discovered that he had HCV in 2010 or 2011.  He believes that he contracted HCV while in CT Correctional Facility in 2009.  Mr. Bratt entered CDOC again in 2013 and is serving a 27-year sentence.  He is currently incarcerated at the Buena Vista Correctional Facility.

88.     CDOC has repeatedly denied Mr. Bratt's requested treatment for his chronic HCV.

89.     Mr. Bratt has completed drug and alcohol treatment programs by successfully completing the Therapeutic Communities program in 2015.  After completion, he stayed in the program as a para-teacher leading some of the classes.

90.     Mr. Bratt challenged the lack of treatment for his chronic HCV through the CDOC grievance process.  The CDOC denied his grievance at all three stages of the process.  Accordingly, Mr. Bratt has exhausted all available administrative remedies.

### 6.    *Plaintiff Aaron Miller.*

91.    Plaintiff Aaron Miller is 43 years old and is currently housed at SCF.  He has had HCV for 23 years since he was 18 years old.  His mother and step-father are terminally ill with HCV.  His biological father died from HCV.

92.    CDOC has repeatedly denied Mr. Miller requested treatment for his chronic HCV.

93.    Mr. Miller challenged the lack of treatment for his chronic HCV through the CDOC's grievance process.  The CDOC denied his grievance at all three stages of the process.  Accordingly, Mr. Miller has exhausted all available administrative remedies.

### 7.    *Plaintiff George Miller.*

94.    Plaintiff George Miller is 60 years old and is currently serving 43 year sentence.  He was diagnosed with HCV in 2007.  He is currently incarcerated at the SCF.

95.    Mr. Miller has consistently been requesting treatment for his HCV since at least 2013.  CDOC has repeatedly denied Mr. Miller's requested treatment for his chronic HCV.

96.    Mr. Miller has completed drug and alcohol treatment programs by successfully completing the Therapeutic Communities program in December, 2015.

97.    Mr. Miller challenged the lack of treatment for his chronic HCV through the CDOC's grievance process.  The CDOC denied his grievance at all three stages of the process.  Accordingly, Mr. Miller has exhausted all available administrative remedies.

### 8.    *Plaintiff Edward Kaneta.*

98.    Plaintiff Edward Kaneta is 66 years old.  He was diagnosed with HCV in 1986.  Mr. Kaneta entered CDOC in 1981 and is serving a sentence of 20 years to life.  He is currently incarcerated at the SCF.

ACTIVE\50822207.v6-9/9/17

99.     CDOC has denied Mr. Kaneta requests for treatment for his chronic HCV.

100.    Mr. Kaneta challenged the lack of treatment for his chronic HCV through the CDOC's grievance process.  The CDOC denied his grievance at all three stages of the process.  Accordingly, Mr. Kaneta has exhausted all available administrative remedies.

## V. <u>CLASS ACTION ALLEGATIONS</u>

101.    Plaintiffs bring this claim on behalf of themselves, and pursuant to Fed. R. Civ. P., 23(a) and 23(b)(2), a class of:

> All current and future prisoners in the custody of CDOC who have been or will be diagnosed with chronic Hepatitis C, who have at least 24 weeks or more remaining on their sentences and a life expectancy of more than one year, with the exception of prisoners who are already receiving or have already completed treatment with DAA medications.

102.    Plaintiffs seek injunctive and declaratory relief to remedy the wrongdoing of Defendants for themselves and for all members of the putative class.

103.    The requirements of Fed. R. Civ. P. 23 are satisfied by this action.

104.    As of November, 2016, CDOC reports that 2,280 prisoners had been diagnosed with HCV.  Because not all current prisoners have been tested, CDOC's number is undoubtedly low.  The overwhelming majority of these 2,280 prisoners have chronic HCV.  In addition, the class includes future prisoners with chronic Hepatitis C.  Accordingly, members of the class are so numerous as to make joinder impracticable.

105.    There are questions of law and fact common to the entire class because the actions of Defendants complained of herein are applicable to the entire class.  These common questions include, but are not limited to:

      a.     Whether chronic infection with HCV represents a serious medical need;

b.      Whether the community standard of care requires treatment with DAAs for all persons diagnosed with chronic Hepatitis C, except persons with a life expectancy of less than one year;

c.      Whether Defendants have knowingly employed policies and practices that unjustifiably delay or deny treatment for chronic HCV;

d.      Whether Defendants' failure to provide treatment to Plaintiffs and other members of the class in accordance with the prevailing standard of care has put Plaintiffs and members of the class at risk of serious harm;

e.      Whether Defendants are deliberately indifferent to class members' serious medical needs;

f.      Whether Defendants' policies and practices with regard to HCV treatment violates class members' rights under the Eighth Amendment.

106.    Plaintiffs' claims are typical of the members of the class because Plaintiffs and other members of the class were injured by the same wrongful treatment policies, protocols, and practices of Defendants as set forth herein.  Plaintiffs' claims arise from the same course of conduct that give rise to the claims of the members of the class and are based on the same legal theories.

107.    Plaintiffs are able to fairly and adequately represent the interests of the class.

108.    The relief requested herein as applied to all members of the class would be proper.  Defendants have acted or failed to act on grounds generally applicable to the class, so that final injunctive or declaratory relief with regard the class as a whole would be appropriate. Certification of the class under Fed. R. Civ. P. 23(b)(2) is therefore proper.

ACTIVE\50822207.v6-9/9/17

**VI. <u>CLAIM FOR RELIEF</u>**
**42 U.S.C. § 1983**
**VIOLATION OF THE EIGHTH AMENDMENT TO THE UNITED STATES**
**CONSTITUTION**

109.     Plaintiffs re-allege and incorporate the allegations above as if fully set forth herein.

110.     The Eighth Amendment to the United States Constitution guarantees all citizens, including Plaintiffs and members of the class, the right to be free from cruel and unusual punishment.

111.     By the policies and practices set forth herein, Defendants subject Plaintiffs and members of the class to a substantial risk of serious harm and untimely death from inadequate medical care.  Defendants have been and are aware of all the deprivations complained of herein, have adopted policies and practices that institutionalize those deprivations, and have been and are deliberately indifferent to the deprivations.  Defendants' acts and omissions in failing to provide adequate medical care constitute deliberate indifference to the serious medical needs of prisoners infected with HCV, in violation of Plaintiffs' and members of the class's rights under the Eighth Amendment.

112.     Under 42 U.S.C. § 1983, Plaintiffs and the class are entitled to a declaration that Defendants' written and unwritten policies, customs, and practices exhibit deliberate indifference to Plaintiffs' serious medical needs.  Plaintiffs and the class are also entitled to an injunction requiring Defendants to adopt policies and practices that adequately provide for the serious medical needs of prisoners with chronic HCV.

23

113.     Plaintiffs and members of the class have suffered and will continue to suffer irreparable injury as a result of Defendants' wrongful policies and practices, unless granted the relief that they request.

## VII. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

g.     Declare that the suit is maintainable as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2);

h.     Declare that the policies and practices of Defendants, as set forth herein, are in violation of the rights of Plaintiffs and the Plaintiff class under the Eighth Amendment to the United States Constitution;

i.     Enjoin Defendants, their agents, employees, officials, and all persons acting in concert with them, from subjecting Plaintiffs and members of the class to the unconstitutional policies and practices described herein;

j.     Order Defendants to develop and implement, as soon as is practicable and in no even later than three months of the date of such order, a plan to eliminate the substantial risk of serious harm that Plaintiffs and members of the class suffer due to the unconstitutional policies and practices described herein. Defendants' plan shall include, at a minimum, a hepatitis-C treatment policy that comports with the community standard of care and the advice of medical experts and that ensures the Plaintiffs and members of the Class are treated with appropriate direct-acting antiviral drugs;

      k.      Award Plaintiffs the costs of this suit, reasonable attorneys' fees, and litigation expenses pursuant to 42 U.S.C. § 1988 and other applicable law; and

      l.      Grant any further relief, legal and equitable, as this Court considers just and proper.

Dated:  September 9, 2017

            Respectfully submitted,


FOX ROTHSCHILD LLP

  /s/ Christopher P. Beall                    /s/ Mark Silverstein

Christopher P. Beall, #28536            Mark Silverstein, #26979
Neal S. Cohen, #14037                  Sara R. Neel, #36904
Dana S. Katz, #49160                   Arash Jahanian, #45754
Jacob J. Baer, #47051                 ACLU Foundation of Colorado
Fox Rothschild LLP                    303 E. Seventeenth Ave., Suite 350
1225 Seventeenth Street, Suite 2200     Denver, Colorado 80203
Denver, Colorado 80202               Phone: 303.777.5482
Phone: 303.292.1200                Fax:     303.777.1773
Fax:     303.292.1300                Email:  msilverstein@aclu-co.org
Email:  cbeall@foxrothschild.com           sneel@aclu-co.org
       ncohen@foxrothschild.com          ajahanian@aclu-co.org
       dkatz@foxrothschild.com
       jbaer@foxrothschild.com


In cooperation with the
ACLU Foundation of Colorado

*Attorneys for Plaintiffs*